UNITED STATES U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

MONSOON BLOCKCHAIN STORAGE,
INC.,

                  Plaintiff,

       -against-

MAGIC MICRO CO., LTD.,

                  Defendant.

------------------------------------------------------- X

Civil Action No.. 22-CV-3114 (JGLC)

**DEFAULT JUDGMENT
CONFIRMING ARBITRATION
AWARD**

      This action having been commenced on April 14, 2022 by the filing of the Summons and Petition seeking to confirm an April 14, 2021 arbitration award in favor of petitioner, Monsoon Blockchain Storage, Inc. (ECF No. 1); and a copy of the Summons and Petition having been personally served on the respondent, Magic Micro Co., Ltd., on August 4, 2022 by personal service on Jong Sub Kim via the Hague Convention (ECF No. 8); and a proof of service having been filed on October 24, 2022; and a Clerk's Certificate of Default having been filed on February 1, 2023 because the respondent did not respond to the Petition (ECF No. 11); and respondent's counsel having entered his appearance and opposing the Petition on August 24, 2023 (ECF Nos. 19 and 21); and on July 19, 2024, the respondent being successful in obtaining a stay in the proceedings pending the outcome of bankruptcy proceedings in the Republic of Korea (ECF No. 29); and the Court ordering the parties to submit joint status reports every 60 days during the pendency of the stay (ECF No. 29); and the Court, on September 17, 2024, having granted respondent's counsel's request to withdraw from the case and Ordering the respondent to obtain new counsel by October 23, 2024 (ECF. No. 33); and the responding having been served with a copy of the Court's September 17, 2024 Order by Federal Express on September 18, 2024 (ECF No. 34); and the Court

lifting the stay on the Petitioner's motion on February 26, 2025 (ECF. No. 68); and the Court noting in the February 26, 2025 that respondent had failed to comply with the Court's September 17, 2024 Order and is no longer participating in these proceedings; and under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), the Court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207; and it appearing that there is no sufficient reason why this Court should decline to confirm the Arbitration Award; and the Court having conducted a hearing on November 12, 2025 and made certain findings of fact and conclusions of law; and for good cause shown,

**NOW THEREFORE**, it is on this __21st__ day of November, 2025:

**ORDERED, ADJUDGED AND DECREED**, that petitioner Monsoon Blockchain Storage, Inc. shall have judgment **CONFIRMING** the arbitration award against respondent Magic Micro Co., Ltd. in full, as set forth in the Arbitration Award attached as Exhibit A and made a part hereof, and the parties are hereby **ORDERED** to abide by the arbitrator's award.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that in accordance with the Arbitration Award, petitioner Monsoon Blockchain Storage, Inc.'s award of $27,000,000 against respondent Magic Micro Co., Ltd. is subject to interest which accrues from March 15, 2019 through and until the amount is paid in full at a compounding rate of 1% per month, which as of November 12, 2025, amounts to **$59,258,723.63**. *See* Exhibit A, at ¶ 192(a).

8080333

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that in accordance with the Arbitration award, the arbitrator awarded Monsoon legal fees and disbursements in the amount of **$138,460.30**, and transcription costs in the amount of **$10,743.52**.  See Exhibit 1, at ¶ 192(e).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that in accordance with the Arbitration award, the arbitrator ordered Respondent Magic Micro Co., Ltd. to reimburse Monsoon for the full amount of the arbitration's administrative fees arbitrator's compensation in the total amount of **$143,640.00**.  See Exhibit 1, at ¶ 192(e).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that in accordance with the Arbitration award, the arbitrator ordered respondent Magic Micro Co. Ltd. to reimburse petitioner Monsoon Blockchain Storage, Inc. for legal fees, costs, administrative fees and arbitrator compensation, which amounts to a total of **$292,843.82**.  *See* Exhibit A, at ¶ 192(e).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that in accordance with the Arbitration Award, respondent Magic Micro Co., Ltd.'s award of $3,000,000 against petitioner Monsoon Blockchain Storage, Inc. is subject to interest which accrues from September 27, 2018 through and until the amount is paid in full at a compounding rate of 5% per annum, which as of November 12, 2025, amounts to **$4,246,634.39**.  *See* Exhibit A, at ¶ 192(d).

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that the amount awarded to respondent Magic Micro Co., Ltd. ($4,246,634.39) from petitioner Monsoon Blockchain Storage, Inc. shall be offset and deducted from the amount that was awarded to petitioner Monsoon Blockchain Storage from respondent Magic Micro Co., Ltd. ($59,844,411.27) such that, as of the date of the entry of this default judgment, the arbitration award to respondent Magic Micro Co., Ltd. from petitioner Monsoon Blockchain Storage, Inc. shall be deemed SATISFIED and PAID IN FULL, and the amount then due and owing to petitioner Monsoon Blockchain Storage, Inc.

3

shall be **55,597,776.90**, which shall be subject to interest at 1% compounded monthly, until paid

in full, in accordance with the Arbitration Award.

The Clerk of Court is respectfully directed to enter judgment consistent with this order and close the case.
SO ORDERED.

_Jessica Clarke_

Honorable Jessica G. L. Clarke
U.S. District Judge
Southern District of New York

Dated: November 21, 2025
       New York, New York

4

# Exhibit A

8080333

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

**MONSOON BLOCKCHAIN STORAGE, INC.**

      Claimant

v.                           **ICDR Case No. 01-19-0002-4620**

**MAGIC MICRO CO., LTD.**

      Respondent

---

## FINAL AWARD

---

      I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement contained in the Monsoon Blockchain Storage, Inc. Series A Preferred Stock Purchase Agreement between Monsoon Blockchain Storage, Inc. and Magic Micro Co., Ltd. dated as of 23 November 2018, and having duly heard the proofs and allegations of the Parties, do hereby AWARD as follows:

1.    This is the final award in an arbitration between Monsoon Blockchain Storage, Inc. ("**Monsoon**" or "**Claimant**") and Magic Micro Co., Ltd. ("**Magic Micro**" or "**Respondent**") (together, Claimant and Respondent are the "**Parties**," and each is a "**Party**").

2.    The Parties' dispute arises out of the Monsoon Blockchain Storage, Inc. Series A Preferred Stock Purchase Agreement entered into as of 23 November 2018 between Magic Micro and Monsoon (the "**SPA**") and an "**Extension Agreement**" dated as of 12 February 2019.

3.    According to Monsoon, Magic Micro entered into binding agreements in which it undertook to pay US $30 million[1] in exchange for Series A Shares in Monsoon. However, Magic Micro failed to fund $27 million. Monsoon contends that this failure breached the Parties' agreements, entitling Monsoon to recover the outstanding $27 million as well as additional damages of $300 million for a second round of funding that Monsoon alleges failed because of Magic Micro's default.

4.    Magic Micro disputes that the agreements relied upon by Monsoon are binding and contends that third party financing was a condition to payment. In the alternative, it contends that its performance was excused by Monsoon's breach of express

---

[1] All amounts in this Final Award are in US currency unless stated otherwise.

representations and warranties or by reason of impossibility, impracticability and frustration of purpose. Magic Micro also alleges misrepresentations by Monsoon that entitle it to rescind the stock transaction and/or to reformation and demands a return of $3 million which it did invest in Monsoon.

5.  For the reasons that follow, Monsoon generally has prevailed on its claims and Magic Micro's counterclaims are granted in part and otherwise dismissed.

## I.    Case Participants

6.  Monsoon is a technology company incorporated under the laws of Delaware with its principal place of business at 2877 Paradise Rd., #702, Las Vegas, Nevada, 89109.

7.  Initially, Monsoon was represented by Gregory T. Casamento of Locke Lord LLP in New York.

8.  With its Amended and Restated Demand for Arbitration dated 31 October 2019, Claimant changed its counsel to William Kirtley, Anne-Sophie Partaix, Zuzana Vysudilova, and Nina A. Jankovic of Aceris Law LLC ("**Aceris**") in Geneva, Switzerland. On or around the time of the evidentiary hearing, Isabela Monnerat Mendes of Aceris also made an appearance.

9.  Magic Micro is a publicly traded Korean company that has historically manufactured and distributed LED components. Its principal place of business is 15, Sinwon-ro 133 beon-gil, Danwon-gu, Ansan-si Gyeonggi-do, Republic of Korea.

10. Initially, Magic Micro was represented in the arbitration by John M. Tanski and Jarod G. Taylor of Axinn, Veltrop & Harkrider LLP ("**Axinn**") in Hartford, Connecticut and by Felix J. Gilman and Eva H. Yung of Axinn's New York office.

11. Magic Micro was also represented by Nari Hong and Hyuck-Je Lee of Hanil Law Corporation ("**Hanil Law**") in Seoul, Korea.

12. On 2 June 2020, Axinn withdrew as counsel for Respondent.

13. On 23 June 2020, Hanil Law gave notice that Respondent's new U.S. counsel would be Aharon Kaye of Gutnicki LLP ("**Gutnicki**") in Skokie, Illinois. Appearances by Gutnicki in the arbitration were also made by Valerie Lengerich and Chris Barta.

14. On 4 August 2020, Hanil Law gave notice that it was withdrawing as counsel for Magic Micro.

## II.    The Arbitration Agreement

15. Claimant initiated arbitration pursuant to Section 6.13 of the Monsoon Blockchain Storage, Inc. Series A Preferred Stock Purchase Agreement entered into as of 23

November 2018 between Magic Micro and Monsoon.  Section 6.13 provides:

> Dispute Resolution.  Any unresolved controversy or claim arising out of or relating to the Agreement, except as (a) otherwise provided in the Agreement, or (b) any such controversies or claims for which a provisional remedy or equitable relief is sought, shall be submitted to mandatory, final and binding arbitration before the American Arbitration Association (the "AAA"), pursuant to the United States Arbitration Act, 9 U.S.C., Section 1 et seq. Either party may commence the arbitration process called for by this Agreement by filing a written demand for arbitration with the AAA and giving a copy of such demand to each of the other parties to this Agreement. The parties will cooperate with the AAA and with each other in promptly selecting an arbitrator from the AAA's panel of neutrals, and in scheduling the arbitration proceedings in order to fulfill the provisions, purposes and intent of this Agreement. If no agreement as to selection of an arbitrator can be reached within thirty (30) days after the responding party's delivery of an answer to the written demand for arbitration, then the parties shall request that the AAA select an arbitrator having reasonable experience in corporate finance transactions of the type provided for in this Agreement. The arbitration shall take place in Las Vegas, Nevada, in accordance with the AAA rules then in effect, and judgment upon any award rendered in such arbitration will be binding and may be entered in any court having jurisdiction thereof. There shall be limited discovery prior to the arbitration hearing as follows: (i) exchange of witness lists and copies of documentary evidence and documents relating to or arising out of the issues to be arbitrated, (ii) depositions of up to three party witnesses per side and (iii) such other depositions and discovery as may be allowed by the arbitrators upon a showing of good cause. Depositions shall be conducted in accordance with Section 6.3, the arbitrator shall be required to provide in writing to the parties the basis for the award or order of such arbitrator, and a court reporter shall record all hearings, with such record constituting the official transcript of such proceedings. The prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled. Each of the parties to this Agreement consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Nevada or any court of the State of Nevada having subject matter jurisdiction.

16.   As recited in Procedural Order No. 1, although the Arbitration Agreement specifies that the arbitration shall "take place in Las Vegas, Nevada," after the arbitration was commenced, the Parties agreed through their legal representatives that the seat of the arbitration would be New York, New York.  The Parties also agreed through their legal representatives that the applicable arbitration rules are the Commercial

Arbitration Rules of the American Arbitration Association ("**AAA**"), as amended and effective 1 October 2013 (the "**AAA Rules**" or the "**Rules**"), including its Procedures for Large, Complex Commercial Disputes.

17.  The language of the arbitration is English.

### III.  Applicable Law

18.  Pursuant to Section 6.3 of the SPA and Section 10 of the Extension Agreement, the Parties' dispute is governed by the laws of the state of New York.

### IV.  Procedural History

19.  Claimant filed a Demand for Arbitration (the "**Demand**") against Respondent on 7 August 2019.

20.  On 27 September 2019, Respondent submitted its Answer to Demand for Arbitration (the "**Answer**").

21.  On 31 October 2019, Claimant submitted an Amended and Restated Demand for Arbitration ("**Amended Demand**").

22.  On 15 November 2019, the International Centre for Dispute Resolution ("**ICDR**"), a division of the AAA, notified the Parties that consistent with their mutual preference resulting from their respective strike and rank list selections, it had appointed Stephanie Cohen to serve as the sole arbitrator in the case.

23.  On 21 November 2019, Respondent filed its Answer to Amended and Restated Demand for Arbitration ("**First Amended Answer**").

24.  A preliminary hearing was held by telephone on 17 December 2019, following which the Arbitrator issued Procedural Order No. 1 dated 7 January 2020 establishing a schedule and procedures for the conduct of the arbitration.  Among other things, the schedule established a deadline in January 2020 for the amendment of claims and counterclaims.

25.  On 7 January 2020, Respondent submitted, and requested leave to file, counterclaims ("**Counterclaims**") against Claimant.

26.  There being no objection by Claimant, and in consideration of the early stage of proceedings and lack of prejudice to Claimant, on 14 January 2020, the Arbitrator deemed the Counterclaims to be admitted under R-6 of the AAA Rules.

27.  On 28 January 2020, Claimant submitted its Statement of Claim, together with exhibits and legal authorities.

28. On 11 March 2020, Respondent submitted its Statement of Defense, together with exhibits and legal authorities.

29. In Procedural Order No. 2 dated 5 April 2020, the Arbitrator ruled on certain disputes between the Parties relating to requests for the production of documents.

30. In Procedural Order No. 3 dated 10 April 2020, the Arbitrator denied Respondent's motion for leave to serve a second (and untimely) set of document requests, stating that in consideration of the Parties' submissions and the issues in dispute, the standard for document requests under R-22(b) of the AAA Rules, the Arbitrator's rulings on Respondent's first set of document requests in Procedural Order No. 2, and the justifications articulated by Respondent in its Stern Schedule,[2] it would be "unnecessary and inefficient" to require Claimant to respond further to the second set of requests.

31. On 5 May 2020, Respondent moved for a 90-day stay of the proceedings due to the COVID-19 pandemic, arguing, in part, that a three-month pause might be sufficient to allow depositions of up to three party witnesses on each side (per the Arbitration Agreement) to take place in person. Claimant objected and a status conference was convened on 8 May 2020.

32. On 11 May 2020, the Arbitrator issued Procedural Order No. 4 determining that depositions would take place remotely, via videoconference, and that a 30-day extension of all procedural deadlines would be appropriate to account for changed circumstances, except for the pre-hearing conference and the evidentiary hearing, which would be rescheduled until a date to be determined after consultation of the Parties.

33. On 15 May 2020, Respondent asked for leave to serve two third-party subpoenas for documents, and Claimant opposed the request on 20 May 2020. Following a status conference with the Parties, on 27 May 2020, the Arbitrator issued Procedural Order No. 5, in which: (i) Claimant was ordered to produce certain documents, failing which Respondent was authorized to take certain steps to seek those documents from a third party; and (ii) all other pending requests were denied.

34. On 2 June 2020, Axinn withdrew as counsel for Respondent.

35. On 9 June 2020, Claimant asserted that Respondent had failed to cooperate in scheduling depositions and asked the Arbitrator to determine that Respondent had waived its right to hold any depositions and to cancel all depositions.

36. That same day, the Arbitrator issued directions regarding a status conference and Respondent's failure to respond to various communications.

---

[2] **"Stern Schedules"** were used by the Parties to assert, justify, and respond to requests for the production of documents.

37.  On 10 June 2020, Respondent requested a two-extension of the proceedings to seek U.S. counsel.

38.  After considering Claimant's objection, the existing schedule, the closure of ICDR hearing facilities in light of the COVID-19 pandemic, and other relevant factors, on 11 June 2020, the Arbitrator postponed a status conference to discuss rescheduling the evidentiary hearing and other procedural deadlines.

39.  A status conference was held by telephone on 24 June 2020, following which the Arbitrator issued Procedural Order No. 6 dated 24 June 2020, directing the Parties to confer regarding rescheduling the hearing from September until late November or December 2020 and to discuss possible contingency plans (such as convening the hearing via videoconference) in case all or most participants could not convene in one physical location for an evidentiary hearing.

40.  By e-mail dated 3 July 2020, the Arbitrator resolved a dispute between the Parties regarding a request by Respondent to serve certain third party subpoenas further to Procedural Order No. 5, denying the request on the basis that Respondent had failed to seek any voluntary production of documents as required by Procedural Order No. 5, substantially re-wrote the requests made in its original request for third party subpoenas and went beyond the scope of documents ordered to be produced by Claimant under Procedural Order No. 5, and sought to re-open issues already decided based upon arguments that could and should have been raised earlier but were not.

41.  In addition, the Arbitrator granted requests by Respondent, over Claimant's objection, to depose and request documents from non-party witness Michael Woods, finding good cause under the Arbitration Agreement.

42.  A further status conference was held by telephone on 6 July 2020, following which the Arbitrator confirmed via e-mail that the Parties agreed an in-person hearing would be scheduled for 1-3 December 2020 and that it was reasonable to defer until 20 October 2020 any determination about whether the hearing should be conducted via videoconference or postponed in the event that an in-person hearing were not possible due to the COVID-19 pandemic.

43.  On 9 July 2020, the Arbitrator issued Procedural Order No. 7: (i) resolving outstanding disputes regarding Respondent's subpoena of Woods and attaching an executed subpoena; and (ii) incorporating a revised timetable agreed by the Parties.

44.  In Procedural Order No. 8 dated 19 July 2020, the Arbitrator denied a request by Respondent to issue non-party subpoenas in connection with the issues addressed by Procedural Order No. 5.

45.  In Procedural Order No. 9 dated 17 August 2020, the Arbitrator: (i) denied Respondent's request to add Donald Basile and Woods, individually, as parties to the arbitration and respondents to Magic Micro's counterclaims; (ii) denied Respondent's request to state new counterclaims against Claimant sounding in fraud, negligent misrepresentation, and violations of the Securities Exchange Act of 1934 and the Racketeering Influenced and Corrupt Organizations Act, pursuant to R-6 of the AAA Rules; (iii) granted leave to Respondent to amend its defenses (generally, to expand on alleged breaches of contractual representations); and (iv) granted, in part, a motion by Respondent to compel Claimant to produce certain documents.

46.  In denying Respondent's request to join Basile and Woods to the arbitration, Procedural Order No. 9 noted that the Arbitration Agreement gives the parties to that agreement an express contractual right to participate in "selecting an arbitrator from the AAA's panel of neutrals," but that if Basile and Woods were to then be joined as parties, they would have be deprived of any such opportunity, raising serious concerns about whether any proceeding joining Basile and/or Woods without their consent after appointment of the arbitrator would comply with the Arbitration Agreement, as well as concerns about procedural fairness and equal treatment of *all* parties, new and existing, to the arbitration.

47.  On 19 August 2020, Respondent submitted its Amended and Restated Defenses and Counterclaims pursuant to Procedural Order No. 9 ("**Second Am. Def. and CC**").

48.  By e-mail dated 24 August 2020, the Arbitrator granted a request by Respondent to extend certain procedural deadlines in light of the timing of the Woods deposition and resolved a dispute about Claimant's production of documents pursuant to Procedural Order No. 9.

49.  On 3 September 2020, Claimant submitted its "**Reply**" with exhibits and legal authorities.

50.  Pursuant to the Arbitration Agreement, between July and October 2020, the Parties noticed and conducted the following depositions, and in Procedural Order No. 10 dated 14 September 2020, the Arbitrator resolved certain disputes relating to the Woods deposition:

   a.  Claimant's deposition of Jang on 20-21 July 2020 (transcribed as R126, R127);
   b.  Respondent's deposition of Basile on 22-23 July 2020 (transcribed as R45, R46);
   c.  Respondent's deposition of Woods on 2 October 2020, conducted in the video presence of the Arbitrator (transcribed as R106) and including some questioning by Claimant.

7

51.  On 1 October 2020, Respondent submitted its **"Rejoinder"** with exhibits and legal authorities, including the following witness statements:

   a.  witness statement of William Jang, former CEO of Magic Micro and currently an adviser to Magic Micro, dated 29 September (R60) (**"Jang WS"**);

   b.  witness statement of Eunice Kwon, CEO of Teamw.e, a blockchain **"ICO"** (initial coin offering) marketing and consulting company, dated 29 September 2020 (R79) (**"Kwon WS"**);

   c.  witness statement of Hyung Min Kim, a broker for A's Japan LLC (**"A's Japan"**) between November 2018 to April 2019 and current CEO of Magic Micro, dated 29 September 2020 (R78) (**"HM Kim WS"**);

   d.  witness statement of Jong Kuk No, CEO of Monsoon Korea, formerly known as GNK Corp., dated 29 September 2020 (R80) (**"No WS"**);

   e.  witness statement of Byung-Ju Kim, an attorney with Dongin Law Group in Korea, dated 12 November 2020 (R156) (**"BJ Kim WS"**);

   f.  witness statement of Hannah Kim, Technical Marketing Communications Manager for Magic Micro from October 2018 to September 2020, dated 1 October 2020 (R61) (**"H. Kim WS"**);

   g.  witness statement of Jingqui Mei, a corporate lawyer with Gutnicki, dated 7 October 2020 (R62) (**"Mei WS"**);

   h.  expert report of Brian C. Becker on valuation logic and damages calculations, dated 1 October 2020 (R82) (**"Becker Report"**); and

   i.  expert report of computer and network security consultant Seth Nielsen, dated 1 October (R81) (**"Nielsen Report"**).

52.  In Procedural Order No. 11 dated 13 October 2020, the Arbitrator modified the timetable in consideration of a request by Claimant. In addition, the Order invited the Parties to comment about how the hearing scheduled for 1-3 December should proceed in light of existing restrictions on travel and social distancing due to the COVID-19 pandemic.

53.  In Procedural Order No. 12 dated 20 October 2020, following a status conference with the Parties that same day, the Arbitrator confirmed that there were no objections to convening the hearing via videoconference as scheduled in December 2020, but noted a concern raised by Respondent about potential prejudice depending on what schedule was set for the hearing and how it would accommodate time zone differences, including witness and corporate representatives based in Korea. Accordingly, Procedural Order No. 12 determined that the hearing would proceed via videoconference, subject to the Arbitrator's discretion to determine otherwise to ensure the fairness and/or integrity of the proceedings, and gave directions to the Parties to confer about an appropriate schedule and additional days for the hearing.

54.  Procedural Order No. 12 also recorded the Parties' agreement: (i) to use the Zoom videoconferencing platform for the hearing, hosted by the ICDR; and (ii) to have the Arbitrator draft an order proposing hearing procedures specific to the Zoom

videoconferencing platform and identifying otherwise typical logistical and procedural issues to be considered by the Parties in preparation for the pre-hearing conference. In addition, the Order established a time for a technical test of the Zoom platform.

55.   On 23 October 2020, Claimant submitted supplemental Reliance Documents and the witness statement of Donald Basile, founder of Monsoon,[3] dated 23 October 2020 (**"Basile WS"**). Because Claimant's submission was late by one day, Respondent was granted a corresponding extension.

56.   In Procedural Order No. 13 dated 31 October 2020, the Arbitrator considered an impasse between the Parties regarding an appropriate schedule for the evidentiary hearing and determined that "given the present locations of the case participants, absent the agreement of the Parties, there is no fair and reasonable alternative to adjourning the evidentiary hearing." Thus the Arbitrator held the hearing would be rescheduled unless there was an agreement by the Parties or a "Party is willing to appear at times outside the boundaries established by this Order (i.e., before 7 a.m. and after 11 p.m.) and proposes a schedule that would not require the other Party to appear against its will outside those boundaries and that is otherwise fair and reasonable, in the Arbitrator's discretion. Among the factors relevant to such a determination are the length of time that would be available for presenting evidence each day and the number of hearing days that would be required."

57.   On 12 November 2020, Respondent submitted its "**Rebuttal,**" together with exhibits and the following witness statements and expert reports:

   a.   rebuttal witness statement of William Jang dated 12 November 2020 (R154) (**"Jang Rebuttal"**);
   b.   rebuttal witness statement of Jong Kuk No dated 5 November 2020 (R158) (**"Ko Rebuttal"**);
   c.   rebuttal witness statement of Byung-Ju Kim dated 12 November 2020 (R156) (**"BJ Kim Rebuttal"**);
   d.   rebuttal witness statement of Hannah Kim dated 12 November 2020 (R155) (**"H. Kim Rebuttal"**);
   e.   rebuttal witness statement of Jingqui Mei dated 12 November 2020 (R157) (**"Mei Rebuttal"**);
   f.   sur-rebuttal expert report of Brian C. Becker dated 12 November 2020 (R135) (**"Becker Sur-Rebuttal"**); and
   g.   rebuttal expert report of Seth Nielsen dated 12 November 2020 (R134) (**"Nielsen Rebuttal"**).

---

[3] C64 (Monsoon certificate of incorporation). Respondent asserted in the arbitration that Monsoon and/or Woods held out Woods to be a co-founder of Monsoon and that Monsoon is liable for the conduct and representations of Woods as an apparent agent. RPH Brief at p. 14. Where it was alleged that Woods made certain misrepresentations, the Arbitrator assumed for the sake of argument that Woods was an agent of Monsoon, but given the findings made herein about alleged misrepresentations by Monsoon, it was unnecessary to make any determination regarding Woods' legal status in relation to Monsoon.

58. On 24 November 2020, the Arbitrator issued Procedural Order No. 14: (i) recording the consent of the Parties to a hearing schedule, in lieu of adjournment;[4] and (ii) establishing procedures for the hearing following consultation of the Parties and a pre-hearing conference on 17 November 2020. With respect to scheduling, the Arbitrator noted that following Procedural Order No. 13:

> Claimant proposed a schedule to which Respondent agreed that would require Claimant's Counsel to participate from 11 p.m. to 3 a.m. CET, but would not require any other case participant to participate before 7 a.m. and/or after 11 p.m. local time. By e-mail dated 5 November 2020, Claimant confirmed its consent to appear at those times in order to avoid adjournment of the hearing because of the pandemic and notwithstanding that Respondent would be able to appear at the hearing at more favorable times.

59. In anticipation of the hearing, a dispute arose on or around 13 November 2020 about Claimant's proposed designation of Christopher Basile ("**C. Basile**"), brother of Donald Basile, as a person who it wished to have attend the hearing. Although Claimant offered varying explanations about C. Basile's past and present connections to Claimant, ultimately, Claimant represented on 24 November 2020 that "Chris Basile has always been a legal representative of Claimant and will continue to be one."

60. In Procedural Order No. 15 dated 30 November 2020, pursuant to R-23(d) of the Rules, the Arbitrator denied (without prejudice) a request by Respondent to draw an adverse inference against Claimant with respect to the "evidence and witnesses Claimant has withheld, and to "bar Christopher Basile's attendance from the hearing as he was not properly presented as a fact witness." The Arbitrator found no basis to conclude that C. Basile was "withheld as a witness" and also stated that whether Claimant had withheld documents "relating to or arising out of the issues to be arbitrated":

> cannot be determined in a vacuum, but can only be assessed according to whether (a) Claimant has relied on documents involving or relating to Mr. Basile that it has not produced; and/or (b) Respondent asked for certain documents in the arbitration that Claimant was ordered to produce, Respondent reasonably believes those documents exist, but they were not produced by Claimant. Respondent fails to provide any such analysis. Yet if Respondent asks the Arbitrator to draw "an adverse inference against Claimant with respect to the evidence" Claimant has withheld, it is incumbent

---

[4] In general, the hearing was scheduled to take place from 5-9 p.m. ET, which corresponded to the following times in other time zones where there were case participants: 2-8 p.m. PT; 4-10 p.m. CT; 11 p.m.-3 a.m. CEST; and 7-11 a.m. KST.

upon Respondent to identify what evidence it believes was withheld and the specific inferences (what facts? what conclusions?) that it says the Arbitrator can and should draw as a result.

61. Respondent subsequently requested an adverse inference in its Post-Hearing Brief that Monsoon did not make reasonable attempts to mitigate its claimed damages but not with respect to any other issues.[5]

62. By agreement of the Parties, as part of the evidentiary hearing, on 30 November 2020, the Parties submitted pre-recorded, video opening statements which were marked as C-Dem1 and R-Dem1, together with slide presentations marked as C-Dem2 and R-Dem2. As the opening statements comprised part of the evidentiary hearing, they were transcribed by a stenographer,[6] along with the remainder of the evidentiary hearing, which took place by Zoom videoconference, hosted by the ICDR, on 30 November, 1-3 December, and 7-10 December 2020.

63. In addition to witnesses and technical support personnel, hearing attendees on behalf of the Parties included the Parties' external counsel of record from Aceris and Gutnicki as identified above, C. Basile as a legal representative for Claimant, and Jay Hyun Noh as a corporate representative for Respondent.

64. At the outset of the videoconference portion of the proceedings on 30 November, the Arbitrator addressed certain questions to the Parties about their opening statements, following which the Parties presented their witnesses for examination.

65. All fact and expert witnesses who submitted pre-hearing witness statements or expert reports testified at the hearing, with several witnesses testifying with the aid of a Korean language interpreter. From time to time, Respondent objected and the Arbitrator intervened because of concerns about the quality and accuracy of translations, leading to certain questions and answers being repeated or corrected, as well as a discussion between the Arbitrator and the Parties on Day 3[7] of the hearing about whether the interpreter should be replaced.[8] Claimant deferred to Respondent with respect to whether to make any replacement, and Respondent ultimately determined not to do so.[9]

---

[5] RPH Br. at p. 44.

[6] By agreement of the Parties, each Party arranged for transcription of its own opening statement, but the Parties jointly engaged transcription services for the remainder of the hearing. For at least a portion of the hearing, beginning on Day 5, the Arbitrator understands that Respondent did not have access to "realtime" transcription due to a payment issue with the transcription service, but it stated no objection to Claimant continuing to use realtime and did not seek any relief from the Arbitrator.

[7] The hearing transcript is cited by reference to "**Tr.**," followed by the hearing day (e.g., Day 2) and either page or page:line numbers.

[8] *See, e.g.*, Tr. Day 2 at 37:2ff, 43; Day 3 at 69:21-73:2.

[9] Tr. Day 4 at 1:25-2:3.

66.  The technological aspects of the hearing proceeded smoothly, but for a brief incident near the end of a witness examination when the stenographer disconnected. Because there were appropriate back-ups in place, this had no impact on preparation of the transcript. Furthermore, there were no objections that the use of videoconferencing technology or any technical incident affected the fairness of the hearing or any Party's ability to present its case, or that holding the hearing via videoconference rather than in-person prejudiced a Party in any other way. And the Arbitrator does not find that the technology had any such consequences.

67.  On 23 December 2020, the Arbitrator issued Procedural Order No. 16 confirming procedural directions for post-hearing submissions given at the conclusion of the evidentiary hearing, after consulting the Parties.

68.  The Parties submitted their post-hearing briefs on 20 and 21 January 2021, together with legal authorities being relied upon ("**CPH Brief**" and "**RPH Brief**"). Respondent also submitted a "**White Paper Comparison**" and list of materials considered by its expert, Nielsen.

69.  In Procedural Order No. 17 dated 1 February 2021, the Arbitrator gave directions for reply post-hearing briefs to allow the Parties to address issues that they had not previously had the opportunity to comment upon, excluded new factual evidence submitted by Respondent that Claimant did not have the opportunity to address at the hearing, and otherwise denied a motion by Claimant to strike RPH Brief.

70.  On 22 February 2021, the Parties submitted post-hearing replies ("**CPH Reply**" and "**RPH Reply**") along with cited legal authorities.

71.  In Procedural Order No. 18 dated 23 February 2021, the Arbitrator denied a request by Claimant to strike new legal authorities cited by Respondent and to order Respondent to provide evidence of the amount paid to its legal counsel. Procedural Order No. 18 also closed the hearing in accordance with R-39 of the AAA Rules.

72.  On 17 March 2021, through the written agreement of the Parties, the original deadline for the Final Award of 25 March 2021 was extended to 15 April 2021.

## V.   Claims and Requests for Relief

73.  Claimant's requests for relief in this arbitration have taken multiple, yet sometimes subtle, turns. Because shifts in how Claimant framed its requests reflect changing theories about how the Parties' contractual relationship should be construed and because a post-hearing dispute arose in connection with one of Claimant's requests for relief, Claimant's changing pleas are set forth in detail below.

74.  Originally, Claimant asserted claims in the Demand for: (i) breach of contract for Magic Micro's failure to purchase 5,874,980 shares of Monsoon's Series A Preferred Stock pursuant to Section 1.1(c) of the SPA for a total purchase price of

US$30,000,000 and for failing to comply with Section 4 of the Extension Agreement to cure its breach; and (ii) breach of the implied covenant of good faith and fair dealing, arising from Magic Micro's failure to tender payment of the purchase price "at the eleventh hour." Monsoon requested an award in its favor ordering:

    a.  enforcement of the SPA for the outstanding purchase amount of $27,000,000 for which Monsoon remains ready to transfer the agreed upon shares of Monsoon Series A Preferred Stock;

    b.  cancellation of the Convertible Promissory Note;

    c.  an award of interest from March 15, 2019 through and until the outstanding purchase amount is paid in full at a rate of 1% per month pursuant to paragraph 4 of the Extension Agreement;

    d.  an award of reasonable attorneys' fees, costs and necessary disbursements pursuant to Section 6.8 of the SPA; and

    e.  such other and further relief as the Arbitrator may deem just and proper.[10]

75.    In its Amended Demand, Claimant maintained its claims for breach of contract and breach of the implied covenant of good faith and fair dealing, but increased the amount of damages being claimed (from 27 million to 327 million) and deleted any request for specific performance, seeking an award:

    a.  awarding Claimant USD 27,000,000.00 due to Respondent's breaches of the SPA and the implied covenant of good faith and fair dealing;

    b.  awarding Claimant an additional USD 300,000,000.00 for losses caused by its willful breach resulting in A's Japan not funding the USD 300,000,000.00 it was otherwise committed to fund;

    c.  cancelling the Convertible Promissory Note;

    d.  awarding interest from 15 March 2019 through and until the outstanding purchase amount is paid in full at a rate of 1% per month pursuant to Section 4 of the Extension Agreement;

    e.  ordering Respondent to pay all costs arising out of this arbitration, including Claimant's counsel's fees and expenses; and

    f.  such other and further relief as the Arbitrator may deem just and proper.

76.    In its Reply to Counterclaims, Claimant modified the basis for its first request for relief, to ask for an award of USD 27,000,000.00 "owed under the Extension Agreement due to breaches of the [SPA] and/or on the basis of the implied covenant of good faith and fair dealing." In addition, it restated a request for specific performance, as an alternative to its first request: "[i]n the alternative, ordering Respondent to perform its obligations to pay under the [SPA] and the Extension Agreement immediately."

---

[10] Demand at VII.

77. Ultimately, in its Post-Hearing Brief and Post-Hearing Reply, Claimant requests an award:

   a. awarding Claimant the USD 27,000,000.00 owed by Respondent either (1) as per the express terms of the Extension Agreement, (2) on the basis that the Extension Agreement is an account stated, (3) due to Respondent's breaches of the Stock Purchase Agreement and/or (4) on the basis of the implied covenant of good faith and fair dealing;

   b. in the alternative, ordering Respondent to perform its obligation to fund under the Preferred Stock Purchase Agreement and the Extension Agreement immediately, while paying overdue contractual interest;

   c. awarding Claimant USD 300,000,000.00 in damages caused by Respondent's breach of contract resulting in A's Japan not funding USD 300,000,000.00;

   d. cancelling the Convertible Promissory Note;

   e. awarding interest from 15 March 2019 through and until the outstanding purchase amount is paid in full, at a rate of 1% per month pursuant to Section 4 of the Extension Agreement, as well as awarding this contractual rate of interest on any other amount that is awarded, starting from the date of the Final Award until the awarded amounts are paid;

   f. ordering Respondent to pay all costs arising out of this arbitration, including Claimant's counsel's fees and expenses; and

   g. such other and further relief as the Arbitrator may deem just and proper.

78. In the Answer and Counterclaims, Respondent asserted counterclaims for: (i) anticipatory repudiation of the note and note purchase agreement dated 24 September 2018 (the "**Note**" and the "**NPA**"); (ii) mutual mistake/rescission of the SPA and Extension Agreement; and (iii) in the alternative, mutual mistake/reformation of the Extension Agreement. Magic Micro requested an award:

   a. holding its performance under the SPA and Execution Agreement discharged for failure of conditions precedent, impossibility, commercial impracticability, and frustration of purpose;

   b. rescinding the SPA and Extension Agreement;

   c. awarding Magic Micro repayment of its USD 3,000,000 loan to Monsoon, plus 5% annual compounding interest as provided for under the NPA and Note;

   d. in the alternative, reforming the Extension Agreement so that all amounts payable thereunder are due two years from the date of reformation of the agreement (to the extent that investment is permissible under Korean law);

   e. awarding Magic Micro attorney fees as the prevailing party under the SPA and/or Extension Agreement; and

   f. granting such other and further relief as the Tribunal deems just.

14

79.  Consistent with this, but in summary form, Respondent's ultimate request for relief pursuant to its Post-Hearing Reply is for:

> judgement in favor of Magic Micro on Monsoon's claims; rescission or reformation of the Revised Term Sheet, SPA, and Extension Agreement; repayment of Magic Micro's $3 million loan to Monsoon plus interest pursuant to the Note and NPA; attorneys' fees and costs as the prevailing party; and other further relief as appropriate.

## VI.    Background to the Dispute

80.  The following summary of background facts and contractual provisions is based on the documentary evidence and witness testimony submitted by the Parties. It is not intended to be a complete recitation of all facts put before the Arbitrator, but only of those that are most relevant to determination of the dispute.

81.  In or around August 2018, Magic Micro received a **"White Paper"** providing an overview of a U.S.-based start-up called Monsoon Blockchain Storage, Inc. that was seeking an investment of $30 million.[11] The White Paper described Monsoon as a "blockchain-based decentralized protocol that aims to construct a worldwide storage and cloud optimization network of users and providers."[12] It also described "object technology roots" starting in 2012 with "over $30 million … estimated to have been invested in this technology stream," formal and informal advisors, and projected revenue and profit exceeding $100 million in its third year from the close of preferred funding.[13]

82.  The White Paper described Monsoon's intended use of funding and plans for an initial coin offering ("**ICO**") as follows:

> Our capital strategy is complete the one [sic] $30m equity raise of which $12m is used to consolidate the three source technologies. This leaves $18m for operations including coin launch and ICO. We have budgeted this amount to last for 36 months in the absence of revenue and expect to not require any additional equity issuance.
>
> …
> The raise of $300m in the ICO will occur a planned 90 days after the close of the preferred round of $30m. The $300m is reserved for use in building the Monsoon Network and is not expected to be used for operations cost of building the Monsoon company.[14]

---

[11] Amended Defenses and CC, Ex. A.
[12] Amended Defenses and CC, Ex. A at p. 2.
[13] Amended Defenses and CC, Ex. A at pp. 22, 26, 39.
[14] Amended Defenses and CC, Ex. A at p. 42.

83.    William Jang, Magic Micro's CEO from April 2018 to June 2019, testified that the White Paper was provided to him in or around August 2018 by a man named Alex Hong, a Korean businessman living in the United States.[15] Jang says that Hong told him that he was a representative of "Monsoon" and had worked with Monsoon's "co-founder," Michael Woods, who Hong knew from enterprises run by the Rothschild family.[16]

84.    Jang also stated his understanding that Hong "directed Monsoon Korea."[17]

85.    Jong Kuk No, CEO of Korean company Monsoon Korea, testified that around the time that Hong met Jang, Hong was working for Hong's own company, ER Tong, yet alongside Monsoon Korea.[18]

86.    Prior to November 2018, Monsoon Korea was known as GNK Corp., but No changed the company name to "Monsoon Korea" in anticipation of becoming an investor in Monsoon.[19] No explained that the company wanted to be recognized with the Monsoon brand and that it planned to attain management rights to Magic Micro and become the direct investor to Monsoon.[20]

87.    Jang says that after he received the White Paper from Hong (in or around August 2018), he told Hong that Magic Micro could invest a maximum of $3 million of its own funds in Monsoon.[21] Hong apparently told Jang that if Magic Micro transferred $3 million to invest in Monsoon, the rest of the $30 million investment being sought by Monsoon would be taken care of by Hong and an acquaintance of Hong's, Chris Thorne, who was an established investor and chair of an investment firm called Broadline Capital ("**Broadline**").[22]

88.    A few days later, Jang traveled to New York to meet with Thorne, Hong, and Michael Jarman ("**MJ**"), who referred to himself as a Monsoon advisor and promoter.[23] Jang testified that Thorne told Jang that the group should meet with Monsoon, and that MJ said that there would be good opportunities for Magic Micro as a shareholder of Monsoon because Monsoon would be backed by the Rothschild family.[24] It was explained to Hong that at the time, Woods was CEO of Rothschild Asset Management.[25]

---

[15] Jang WS at ¶ 6.
[16] Jang WS at ¶¶ 7, 20-22; Tr. Day 3 (Jang) at 23:6-18.
[17] Tr. Day 2 at 48:20-23.
[18] No WS at ¶ 5; Tr. Day 5 at 57:10-58:4. No's explanation at the hearing deviated from his written testimony which suggested that Hong was an employee of GNK/Monsoon Korea.
[19] No WS at ¶ 4.
[20] No WS at ¶ 4.
[21] Jang WS at ¶ 8.
[22] Jang WS at ¶¶ 9-10.
[23] Jang WS at ¶ 7.
[24] *See* R1.
[25] Tr. Day 3 (Jang) 25:2-8.

89.    At the hearing, Jang explained that connections to the Rothschild family were "relevant and important" because the "Rothschild family and enterprises are considered prestigious in the Korean business community" and "enhanced the level of legitimacy and viability" that he attributed to Monsoon.[26]  Magic Micro's Hannah Kim also underscored the importance of ties to the Rothschild family, explaining her personal belief that the "biggest reason and the biggest motivation for Magic Micro's CEO [to undertake a transaction with Monsoon] at that time was the belief that Rothschild Asset Management or [the] Rothschild family ... was going to ensure that this project was going to be successful."[27]

90.    Jang testified that Magic Micro, Thorne, and Hong all agreed and understood that any investment by Magic Micro would be limited to $3 million.[28] In response to questions from the Arbitrator, however, Jang said that neither Basile nor Woods ever directly promised that Magic Micro's transaction with Monsoon would be subject to third party financing.[29]

91.    Basile testified that Hong/ Monsoon Korea introduced Monsoon to Magic Micro and that Monsoon did not compensate Monsoon Korea for doing so.[30]  Basile gave the following explanation for how Hong came to be in possession of the White Paper:

> Mr. Hong, who I believe I testified I met back in 2016, was also known to our marketing consultant, Mr. Jarman.  We were in the summer of 2016 soliciting feedback on the draft white papers from advisers, from potential partner companies and so forth, on our concept.  I believe Mr. Hong was one of the folks that had received a copy of the white paper, and he took it upon himself, with knowledge of Magic Micro and the Korean market, to bring the opportunity forward to first, I guess, Magic Micro, and then to bring Magic Micro to ourselves within it; within this particular opportunity.  I believe his first discussion was with Mr. Woods on that particular issue.[31]

92.    At the hearing, Jang was clear that Monsoon Korea proposed the original arrangements to Magic Micro for a deal with Monsoon:

> In the beginning, GNK Corporation was the one who proposed the deal with Monsoon.  They offered the white paper and they made an arrangement to meet with Alex Hong and they also made an

---

[26] Jang WS at ¶ 21.
[27] Tr. Day 7 (Hannah Kim) at 30:7-12.
[28] Tr. Day 2 (Jang) at 46:4-17; Day 3 at 23:14-18.
[29] Tr. Day 3 (Jang) at 35:23-36:9.
[30] Tr. Day 1 (Basile) at 148:8-149:22.
[31] Tr. Day 1 (Basile) at 148:23-149:12.

17

arrangement regarding the stock share agreement -- stock
purchase agreement, sorry, including $27 million.[32]

93.    On 11 September 2018, the Parties signed an initial term sheet for Magic Micro's
purchase of 5,874,980 shares of Series A Preferred Stock in Monsoon for a total
investment of $30,000,000.[33]

94.    On or around 18 September 2018, Magic Micro, GNK/Monsoon Korea, and Magic
Micro's largest shareholders, including, indirectly, Jang, through his corporation
Future Techone, entered into an agreement that contemplated an investment in
Magic Micro by GNK in the amount of $27 million.[34] Jang explained the rationale for
this agreement, which ultimately failed to lead to an investment in Magic Micro, as
follows:

> The role of Monsoon Korea was by buying or purchasing the
> management right and the shares of Magic Micro and they would
> operate or manage, and via Monsoon deal, and once the value of
> Magic Micro goes up, they would take benefits out of it. And Alex
> and Monsoon Korea were planning on those, I think.[35]

95.    On 24 September 2018, the Parties signed a revised version of the initial term sheet
(the "**Revised Term Sheet**") to conform to Korean regulatory requirements.[36]
Pursuant to the Revised Term Sheet, Magic Micro undertook to "purchase up to
5,874,980 shares of the Series A Preferred Stock (the 'Stock'), par value $0.0001 per
share, for a total investment of up to $30,000,000 (the 'Total Investment
Amount')."

96.    The Revised Term Sheet also specified:

> $3,000,000 (10% of the Total Investment Amount) (the 'Escrow
> Deposit') shall be wired to an escrow account, designated by and
> agreed upon by both parties of this Term Sheet and the escrow agent.
> Investor will undertake an evaluation of the Company and the Stock,
> including financial and legal due diligence and valuation, in each case
> in accordance with laws and regulations applicable to the Investor. To
> the extent that the Investor has completed such due diligence and
> valuation to the satisfaction of the Investor, the Escrow Deposit will
> be used as consideration in exchange directly for the Stock pursuant
> to the applicable Definitive Agreement. If prior to the completion of
> such due diligence and/or valuation the Company desires the Investor

---

[32] Tr. Day 3 (Jang) at 13:16-21.
[33] Amended Defenses and CC, Ex. B.
[34] Tr. Day 2 (Jang) at 47-50; R5T.
[35] Tr. Day 3 (Jang) at 15:16-21, 23:12-18.
[36] Amended Defenses and CC, Ex. C.

to contribute $3,000,000 to the Company, the Escrow Deposit will be used as consideration in exchange for a convertible note of the Company that automatically converts into Stock pursuant to the applicable Definitive Agreement.

...

If the Investor decides to complete its $30,000,000 investment in the Company, such $3,000,000 shall be deemed to be paid as a part of the Total Investment Amount for purchasing the Stock. ... if there are serious and material issues concerning legal & financial due diligence for the Investor's investing in the Company the balance of the transaction contemplated hereby shall be terminated and each of the Company and the Investor shall deliver to each other mutual general releases with respect to this Term Sheet and the transactions contemplated hereby.

The remaining $27,000,000 shall be paid by the Investor to the Company up to 36 days after the signing date of this Term Sheet.

97.    As contemplated by the Revised Term Sheet, the Parties concurrently executed a Note Purchase Agreement dated 24 September 2018 ("**NPA**") pursuant to which they agreed in Section 2.1 that in return for Magic Micro's payment of $3,000,000 in consideration (the "**Consideration**"), Monsoon would sell and issue to Magic Micro a Note convertible into shares.

98.    On 27 September 2018, Magic Micro paid 3,000,000 into escrow[37] and Monsoon provided Magic Micro with a convertible promissory note dated that day (the "**Note**").[38]

99.    The Introduction to the Note provides:

[Monsoon (the "**Company**")] hereby promises to pay to the order of [Magic Micro (the "**Lender**")] the principal sum of Three Million Dollars ($3,000,000), together with interest thereon from the date of this Note. Interest shall accrue at a rate of five percent (5%) per annum, compounded annually. Unless earlier converted into Conversion Shares pursuant to Section 2.2 of [the NPA], the principal and accrued interest shall be due and payable by [Monsoon] on demand by [Magic Micro] at any time after the Maturity Date.

100.    The Maturity Date is defined in Section 1(h) of the NPA as 24 September 2020.

---

[37] C12.
[38] C5.

101. The Parties agreed that the Note would be automatically converted into shares upon the closing of the "**Next Equity Financing**," in accordance with the terms of Section 2.2 of the NPA.[39]

102. Next Equity Financing is defined in Section 1(i) of the Note as:

> "Next Equity Financing" shall mean the next sale (or series of related sales) by the Company of its Equity Securities following the date of this Agreement from which the Company receives gross proceeds of not less than $5,000,000 (excluding the aggregate amount of debt securities converted into Equity Securities upon conversion of the Notes pursuant to Section 2.2 below or any other convertible debt securities issued prior to the date of such Next Equity Financing).

103. Section 2.2(a) of the NPA provides:

> The principal and unpaid accrued interest of each Note will be automatically converted into Conversion Shares upon the closing of the Next Equity Financing. Notwithstanding the foregoing, accrued interest on this Note may be paid in cash at the option of the Company.

104. Prior to signing the Revised Term Sheet and NPA, Magic Micro had counsel, Joseph Mei of Gutnicki, review and comment on drafts.[40] One of the issues raised by Mei concerned Magic Micro's right of first refusal, which was "not explicitly stated either in the Term sheet or the Note certificate." Mei explained, "[w]e believe this is the parties' understanding and would like to clarify in case there is any misunderstanding." However, Mei made no mention of any third party financing condition and no evidence was presented that the Parties ever discussed whether such a condition could or should be incorporated into their written agreement.[41]

105. After Monsoon (through Basile) rejected Mei's comments, Mei wrote: "Based on your below responses and confirmation, we have no further comments on the note purchase agreement and the term sheet. We are recommending our client to proceed based on your last circulated final documents."[42]

106. As noted above, the Revised Term Sheet required that Magic Micro undertake financial and legal due diligence and valuation prior to determining to complete the $30 million investment in Monsoon, "in each case in accordance with laws and regulations applicable to [Magic Micro]."

---

[39] C5 at § 2.
[40] C141.
[41] C141.
[42] C141.

107.  As part of this due diligence, the Revised Term Sheet further provided that Claimant would appoint Armanino, LLP to value Monsoon for approval by the Financial Supervisory Service in Korea.

108.  On 22 October 2018, Armanino LLP rendered a report opining that the fair market value of Monsoon as of 1 October 2018 was $171 million.[43]  Armamino expressly noted that Claimant is a "start-up entity with no revenue and there is no assurance that it will reach targeted revenue levels and profitability.  Additionally, the Company has limited resources to execute its growth plans."[44]

109.  Respondent also engaged PwC, Jungdong LLC ("**Jungdong**"), Gutnicki, and Jeong Hyang Law[45] Corporation for the due diligence process.  Claimant established a digital data room and provided certain documents to PwC,[46] Jungdong, and Gutnicki during October and November 2018.[47]  Claimant also responded to certain questions, including at a meeting with PwC at the end of October 2018.

110.  Critically, Claimant contends that the White Paper that Jang says Hong provided to Magic Micro (which was marked as Exhibit A to the Answer and Counterclaims) is not the same version of the White Paper that Claimant made available in the digital data room during the due diligence period (which was marked as Exhibit C72) and updated from time to time.[48]  Although it was not possible to prove definitively which form of the White Paper Monsoon gave to Magic Micro, Hong's role in bringing the transaction to Magic Micro's attention provides a reasonable explanation for the discrepancies and for deeming C72 to be the form of White Paper provided by Monsoon.

111.  PwC rendered a report on 22 November 2018.[49]  Among other things, it noted that Claimant had "no operating activities from its incorporation in March 2018," the acquisition of the three core technologies had not been paid as of October 30, 2018, and that the "Company appears to be running heavily on Dr. Donald Basile's ideas, technical skills, work experience and marketing."[50]

112.  On 19 November 2018, Jungdong told Claimant "we have everything we need" and rendered a stock valuation on 23 November 2018.[51]

113.  Jungdong concluded that the share purchase price was "not inappropriate" based upon a discounted cash flow valuation of Monsoon:

---

[43] C13.
[44] C13 at p. 2.
[45] C16, C84.
[46] C17, C18, C19, C20, C22, C23.
[47] C15, C16.
[48] *See* Respondent's White Paper Comparison.
[49] C26, C27.
[50] C26 at pp. 13-15.
[51] C28, C29.

The Corporation applied DCF (Discounted Cash Flow Approach) method for the valuation of the stock value for the Evaluating Company. As of the current standard valuation date, the amount of the newly issued preferred stock subjected for acquisition was calculated to be in the range of USD 26,420,000 – 51,309,000, and the estimate acquisition value of USD 30,000,000 was not discovered with basis for judgement to be inappropriate in view of significance.[52]

114.    On 23 November 2018, the Parties entered into the SPA.[53]

115.    The SPA defines "**Closing**" in Section 1.2 as "10:00 A.M. (local time) on December 14th 2018, or at such other time and place as the Company and Investors … agree upon orally or in writing."[54]

116.    In Section 1.1(c) and Schedule A of the SPA, at Closing, Magic Micro undertook to purchase 5,874,980 Series A Shares of Monsoon for a total purchase price of $30,000,000,"[s]ubject to the terms and conditions of the Agreement."[55]

117.    Section 5.2 of the SPA further obligates Magic Micro, the "**Investor**," to "deliver the purchase price in Section 1.1(c)," except the Parties also agreed that "any amount that the Investor may have deposited with an escrow agent for the purpose of the transactions contemplated by this Agreement may be applied toward the satisfaction of the Investor's payment obligation under Section 1.2 and the condition precedent of this Section 5.2 shall be deemed satisfied hereby when such amount is released from escrow to Company."[56]

118.    Section 4 of the SPA qualifies that Magic Micro's obligations "under subsection 1.1(c) of this Agreement are subject to the fulfillment on or before the Closing of [certain] conditions," including "4.1 Representations and Warranties. The representations and warranties of the Company contained in Section 2 shall be true on and as of the initial Closing."[57]

119.    In Section 6.8, the Parties agreed that "[i]f any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled." Similarly, Section 6.13 on dispute resolution provides that the "prevailing party shall be entitled to

---

[52] C28 at p. 3.
[53] C1.
[54] C1.
[55] C1.
[56] C1.
[57] C1.

reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled."[58]

120. Section 6.9 of the SPA specifies that amendments and waivers of any terms of the Agreement require written consent, while Section 6.12 specifies that the SPA "and the documents referred to herein constitute the entire agreement among the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations, or covenants except as specifically set forth herein or therein."[59]

121. Magic Micro did not pay the balance of the purchase price under the SPA by the scheduled Closing date of 14 December 2018.

122. Following Magic Micro's failure to fund, the Parties considered potential alternative transactions to raise $27 million, including a potential purchase by Monsoon of Magic Micro's shares in LioniX and transactions involving a Japanese entity, A's Japan, whereby A's Japan would make an investment in Magic Micro so, in turn, Magic Micro could pay $12 million to Monsoon.[60]

123. On 21 December 2018, pursuant to a Token Subscription Agreement, A's Japan undertook to pay $50 million to Monsoon for Monsoon Coin by 21 December 2018 and then $250 million by 15 January 2019.[61]

124. A's Japan did not complete its investment by the anticipated closing date, for reasons that are disputed by the Parties. According to Claimant, Magic Micro's default on the Series A Shares caused A's Japan to withdraw. According to Respondent, A's Japan was concerned for tax reasons that the token offering was structured as a security token offering rather than an ICO, as initially contemplated.[62]

125. On 12 February 2019, the Parties signed the Extension Agreement.[63]

126. Section 2 of the Extension Agreement states that the Parties "wish to memorialize a proposed extension of the time to completely fund" the "Series A Stock Purchase Agreements, dated as of December 14, 2018."

127. Section 3 provides that Magic Micro, "acknowledging and to induce Monsoon's temporary forbearance, has committed to fund by wire transfer to Monsoon no later

---

[58] C1.
[59] C1.
[60] C35, C38; Tr. Day 2 (Jang) at 52:4-25, 54:16-55:13, 55:21-56:5, 56:25-57:12; Day 3 at 56:15-57:2, 57:17-58:13.
[61] C6.
[62] R17.
[63] C2.

than March 15, 2019 (the "**Wire Transfer Date**") the initial twelve million dollar ($12,000,000) due under the Series A Agreements."

128.    In Section 4, the Parties agreed that if Magic Micro failed to fund in full by the Wire Transfer Date, "all obligations due under this Agreement and all other existing obligations of Magic Micro under the Series A Agreements, shall become immediately due and payable and Magic Micro agrees to pay such additional interest, and not as a penalty, the amount of one percent 1% per month until paid in full."

129.    However, subject to the payment of the initial $12,000,000, under Section 5, the Parties agreed to a temporary deferment of the remaining $15,000,000 for an "Extension Period" of two years from the date of the Extension Agreement during which period Magic Micro could fund the investment at any time.

130.    The Parties also agreed that during the Extension Period, Monsoon would consider the possibility of acquiring shares owned by Magic Micro in LioniX international as a partial fulfilment of the investment price.[64]

131.    Magic Micro did not pay Monsoon $12 million by 15 March 2019, nor has it subsequently made any payment to Monsoon.

132.    Thereafter, there was a change in Magic Micro's management which resulted in Magic Micro[65] retaining a consultant to review the White Paper.[66] The consultant identified a number of red flags, including the lack of any verifiable connection between Monsoon's purported Advisory Board and Monsoon and the apparent copying of the vast majority of the White Paper from other sources.[67]

133.    On 15 January 2020, it was reported in the press that Chinese smartphone retailer Dixintong Technology Group acquired a minority stake of "U.S.-based blockchain company, Monsoon Blockchain" for a "nine-digit valuation."[68] The evidence presented at the hearing established that Monsoon Blockchain Corporation is a separate Delaware corporation than Claimant that provides consulting services in the blockchain space.[69]

## VII.    Reasons for Decision

134.    In reaching a decision on liability, the Arbitrator has fully considered the Parties' evidence, arguments, and legal authorities.  For clarity, however, the Arbitrator

---

[64] C2 at § 6.
[65] More precisely, the new head of Magic Micro, Hyung Min ("Ryan") Kim, through his company Mind Asset engaged Kwon.
[66] R18.
[67] R19.
[68] R26.
[69] R37; Tr. Day 1 (Basile) 135-141.

refers only to the arguments, evidence, and authorities that are relevant and material to the Arbitrator's decision.

### A.    Magic Micro's Failure to Purchase Series A Shares

135.    The essential elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach.[70]

136.    As a matter of New York law, if a contract is complete, clear and unambiguous, it must be enforced according to the plain meaning of its terms.[71]

137.    A contract is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."[72]  Furthermore, when the intent of the parties can be gleaned from the face of the instrument, matters extrinsic to the agreement may not be considered when construing the contract.[73]

138.    According to Claimant, by failing to fund the purchase of Series A Shares by the extended Closing Date of 15 March 2019, Respondent breached the Extension Agreement (Sections 3 and 4) and the SPA (Sections 1.1(c) and 5).[74]

### a.  Existence of an Operative and Enforceable Contract

139.    Magic Micro argues that it had no obligation to make any payment to Monsoon because there was no operative and enforceable contract between the Parties, for one of three reasons: (i) there was no meeting of the minds between the Parties regarding Respondent's obligations; (ii) third party funding was a condition precedent to Respondent's obligations; or (iii) the Revised Term Sheet, the SPA, and the Extension Agreement are void for illegality.

140.    Each of these defenses fails.

141.    ***Meeting of the minds.*** Magic Micro asserts the basic principle that to create a binding contract, there must be a "meeting of the minds," i.e., "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement

---

[70] RPH Br. at 4, citing *WFE Ventures, Inc., v. Mills,* 139 A.D.3d 1157, 1160 (NY App. Div. 2016).
[71] Statement of Claim at ¶¶ 74 205-207, citing *Oppenheimer & Co. v. Oppenheim,* Appel, Dixon & Co., 86 N.Y.2d 685 (1995); *Painewebber, Inc. v. Bybyk,* 81 F.3d 1193 (2d Cir. 1996); *Am. Express Bank Ltd. v. Uniroyal, Inc.,* 164 A.D.2d 275, 277 (1990).
[72] Statement of Claim at ¶ 74, citing *Krumme v. Westpoint Stevens, Inc.,* 238 F.3d 133 (2d Cir. 2000).
[73] Statement of Claim at ¶ 75, citing *Teitelbaum Holdings v. Gold,* 48 N.Y.2d 51, 56 (1979).
[74] Claimant also contends that Respondent breached the Revised Term Sheet.

with respect to all material terms."[75]  Whether there was a meeting of the minds is determined in light of the totality of the circumstances, considering the parties' conduct and communications, their situation, and the objectives they were striving to attain.[76]

142.  According to Magic Micro, the parties had diametrically opposed understandings, intents, and goals with respect to the SPA and the Extension Agreement and therefore never entered into an enforceable agreement.  In particular, Magic Micro asserts that its understanding was that its investment in Monsoon would be limited to the $3 million that it paid prior to the execution of the SPA and that the Parties were thereafter undertaking a joint effort to solicit and secure third-party investors to fulfill the remaining $27 million investment.[77]

143.  The circumstances of this case do not support a finding that there was a lack of meeting of the minds.

144.  Respondent wrongly seeks to support its position with several legal authorities that are inapposite because they do not involve formal, signed contracts, but instances where contract negotiations were incomplete or involved a series of exchanges with different terms.[78] Where, as here, there is a formal contract, the *Maxim* case illustrates that the terms of that instrument must be the first point of inquiry in seeking to determine if there was a meeting of the minds.[79]

145.  On their face, each of the Revised Term Sheet, the SPA and the Extension Agreement contain all essential terms to enforce a stock purchase transaction, including the number and type of shares being purchased, the price, and the closing date.[80] Moreover, there is no allegation that any relevant term of these agreements is ambiguous or that third party funding is in any way implied by the language of the agreements.  These circumstances strongly favor a finding that there *was* a meeting of the minds, particularly given that: (i) the Parties signed not one, but three separate agreements that establish Respondent's payment obligation without conditioning it on third party financing; and (ii) Respondent is a sophisticated company that sought legal advice before executing the Revised Term Sheet memorializing the same basic transaction echoed in the SPA and Extension Agreement.[81]

---

[75] RPH Brief at p. 4, citing, e.g., *WFE Ventures, Inc. v. Mills*, 139 A.D.3d 1157, 1160 (NY Appellate Division 2016).

[76] RPH Brief at p. 4, citing *Aker v. JJ Fredella Co.*, 237 N.Y.S. 442, 443 (NY Appellate Division 1929).

[77] RPH Brief at pp. 4-8.

[78] *See* CPH Reply at ¶¶ 3-4 (distinguishing cases).

[79] *Maxim Group LLC v. Life Partners Holdings, Inc.*, 690 F. Supp.2d 293 (SDNY Feb. 11, 2010).  Respondent relies on this case in addressing specific performance.  RPH Brief at p. 45.

[80] *See Maxim*, 690 F. Supp. 2d at 309 (rejecting meeting of the minds defense where agreement set forth all material terms of warrants to make them enforceable contracts, including price, numbers of shares, expiration date, and the right to a cashless-exercise option).

[81] C100.

146. The evidence presented at the hearing (*see* ¶¶ 87, 90 above) also established that to the extent that there was any "understanding" or agreement about the limits of Magic Micro's finances and its need for third party financing, it was expressly discussed with Hong and GNK/Monsoon Korea, and then with Broadline and Thorne, *but not with Monsoon*. Magic Micro even negotiated a deal with GNK/Monsoon Korea that should have resulted in a $27 million investment in Magic Micro, but that ultimately fell apart. Significantly, Monsoon was not a party to that deal.

147. ***Failed condition precedent.*** Respondent does not allege that there is an express written financing condition in the agreements, but rather seeks to establish through parol evidence that third party financing was agreed to be a condition precedent to its obligation to fund.

148. Claimant argues that extrinsic evidence of the parties' intent "may be considered when interpreting a contract only if the agreement is ambiguous," and that it may not be relied upon to vary the terms of a written agreement. It also contends that Section 11 of the Extension Agreement unequivocally precludes finding that third party funding was a condition precedent because Section 11 of the Extension Agreement contains explicit language requiring that any additional terms of modification of the agreement be in writing.[82]

149. Respondent, on the other hand, argues that parol evidence is admissible to prove a condition precedent to the legal effectiveness of a written agreement if the condition does not contradict the express terms of the written agreement, and that there can be no such conflict here because there is no express language in the agreements regarding third party financing.

150. The Arbitrator accepts Respondent's argument that parol evidence is admissible to seek to establish a condition precedent that does not contradict the express terms of the written agreement, and that Section 11 of the Extension Agreement does not alter this analysis. However, for the same reasons that Respondent failed to establish that there was no meeting of the minds (*see,* in particular, ¶ 145 *supra*), it failed to establish that third party financing was a condition precedent.

151. In addition, although Respondent argues, and the record establishes, that Magic Micro actively sought third party funding with Monsoon's knowledge,[83] this activity is insufficient to establish an agreement by the Parties that the SPA and the Extension Agreement would not be effective absent third party funding. There is no evidence that Respondent ever told Monsoon it would need to be relieved of any obligation to fund if third party financing fell through (as when Broadline funding fell through in November 2018 prior to entering the SPA) or that Monsoon told

---

[82] CPH Brief at ¶¶ 52ff.
[83] *See* RPH Brief at pp. 5-7.

Magic Micro it would not have to fulfill the obligation to fund if third party financing fell through.  At best, Jang testified, without providing any specific details that would corroborate this evidence, that he told Basile and Woods in September 2018, before signing any term sheet, that Magic Micro "could invest" $3 million, while third parties "could provide" the rest of the funding.[84] However, this is merely evidence that Magic Micro aspired to obtain third party financing, not that financing was a condition precedent.  Moreover, as noted above, the facts that were firmly established at the hearing through detailed testimony by Jang were that he discussed Magic Micro's finance limitations with Hong and GNK/Monsoon Korea, and then with Broadline and Thorne.  None of these persons or entities are Monsoon.

152.  ***Illegality.***  According to Respondent, had the transaction between Magic Micro and Monsoon closed, it would have violated Section 4(a)(2) of the Securities Exchange Act of 1933 ("**1933 Securities Act**"), thus voiding the relevant agreements as a matter of law.[85]

153.  Section 4(a)(2) of the 1933 Securities Act requires that any offering or sale of securities involving a public offering be registered with the U.S. Securities and Exchange Commission.  It is undisputed that whether a transaction falls within the scope of Section 4(a)(2) is a fact-specific analysis that requires consideration of various factors, and no single factor is determinative.[86]

154.  Respondent says that the "lynchpin of the issue is 'whether the investors can fend for themselves" to evaluate the merits and risks of the investment in the shares, and that it was not provided with all of the material needed to make an informed investment decision.[87] In particular, it says that Monsoon provided only unverified financial projections and limited information regarding its business plan, intellectual property, and acquired assets to PwC, Armanino, and Jungdong, and thus that all three firms were "unable to verify or otherwise test" the data and projections Monsoon provided and included cautionary statements in their reports.[88]

155.  However, although Respondent now contends that it did not receive sufficient information to make an informed investment decision, at the time, it expressly confirmed in Section 3.3 of the SPA that it did receive all the information it considered necessary for deciding whether to purchase the shares.  Respondent also represented this to be the case despite that its representatives, counsel, and experts raised red flags that certain information provided by Monsoon could not be independently verified or tested (*see* ¶¶108-111 above).  These circumstances

---

[84] Tr. Day 3 at 33:7-36:22; Jang WS (R60) at ¶ 58.

[85] Rejoinder at ¶ 11; Mei WS (R62) at ¶¶ 36-54; RPH Brief at p. 10.

[86] *Doran v. Petroleum Management Corp.*, 545 F.2d 893 (1977).

[87] Mei WS at ¶ 44.

[88] RPH Brief at p. 25, *citing* R82, Becker Report, §§ II.A., II.B, III.B.I; *See* C-26, PwCReport at 3-8; C-28, Jungdong Report at 3-4; C-13, Armanino Report at 31.

evidence that Magic Micro chose to ignore red flags about investing in Monsoon, not that it lacked information that it needed to make an informed decision.

156. Respondent also argues that Monsoon's offering would have violated Section 4(a)(2) if it closed because Monsoon actively marketed itself and solicited U.S. investment at a 2018 New York Stock Exchange Event and other trade shows and conferences.[89] However, Respondent offered scant evidence about the nature of the marketing and promotion that Monsoon allegedly engaged in at these events, including whether the marketing related to Series A Shares. Because Respondent failed to present sufficient evidence about the alleged nature of Monsoon's marketing, there is insufficient evidence for the Arbitrator to conclude that Monsoon was engaged in illegal marketing and promotion of Series A Shares.

157. For these reasons, Respondent's defense relating to the 1933 Securities Act fails.

b. **Monsoon's Performance of its Contractual Obligations**

158. Respondent rightly argues that the Extension Agreement must be construed as an amendment to the SPA, and thus that Monsoon's obligations, representations, and warranties under the SPA were incorporated into the Extension Agreement. This conclusion follows from the fact that the Extension Agreement contains no integration or merger clause, and instead incorporates the SPA by stating: "Magic Micro and Monsoon are parties to those certain Series A Stock Purchase Agreements, dated as of December 14, 2018 (the *'Series A Agreements'*) and the parties "wish to memorialize a proposed extension of the time to completely fund the Series A Agreements." Furthermore, as a matter of New York law, a subsequent agreement on the same subject matter as a prior agreement "will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract."[90]

159. According to Magic Micro, Monsoon breached several representations and warranties that Monsoon expressly made in the SPA, thereby extinguishing Magic Micro's duty of counter-performance under the SPA and Extension Agreement.[91] Respondent's allegations are without merit.

160. Pursuant to Section 2.1, Monsoon represented that it is "duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted." It also represented that it is "duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties."

---

[89] RPH Brief at p. 10.
[90] RPH Brief at pp. 10-12, citing *CreditSights, Inc. v. Ciasullo*, 2007 WL943352, at *6 (S.D.N.Y. 2007); *Benipal v. Herath*, 251 A.D.2d 933, 934 (N.Y. Appellate Division 1998).
[91] RPH Brief at p. 13.

161.    Respondent alleges that Claimant's representation under Section 2.1 is false because Monsoon is not qualified to transact business in California, "where it is headquartered, or Nevada, where its mailing address is located."[92]  As Claimant points out, however, although "additional administrative obligations" might arise at a later stage, it had not yet launched a product, hired employees, or generated any revenue.[93]  Respondent fails to establish that by taking meetings in states other than Delaware,[94] taking steps to acquire real property in California (supposedly for a potential tech incubator),[95] or receiving mail in Nevada, Claimant was "carrying on business" in those states as a matter of law or that failing to be qualified to transact business in any of those jurisdictions would have a "material adverse effect on Claimant's business or properties."[96]

162.    In particular, although the circumstances surrounding Claimant's attempt to purchase a residential property in California around the time that it entered into the SPA raise questions, Respondent offers no factual support for its speculative and inflammatory assertion that Claimant "fraudulent[ly] misappropriate[ed] corporate funds for personal funds."[97]

163.    Notwithstanding Respondent's assertions, Claimant is a Delaware corporation and submitted its certificate of good standing in that jurisdiction.[98]  For all of these reasons, the Arbitrator finds no breach of Section 2.1.

164.    Respondent next claims that representations made by Claimant in Sections 2.10 and 2.11 of the SPA were false because prior to signing the SPA, Monsoon had already violated Section 10(b) of the Securities Exchange Act of 1934 by making misrepresentations[99] of material fact to Magic Micro and fraudulently inducing Magic Micro's execution of the SPA.[100]

165.    In its Post-Hearing Brief, Respondent provides a five-paged list of allegedly material factual misrepresentations, which it contends were made to Magic Micro to induce its execution of the SPA, with the vast majority consisting of misrepresentations that Magic Micro contends, based on the testimony of its blockchain consultant, Kwon, as well as that of its expert witnesses Becker and Nielsen, are in the White Paper. However, Respondent cannot establish that it was fraudulently induced by Monsoon

---

[92] Second Am. Defense and CC at p. 25.
[93] Reply at ¶ 142.
[94] *See* R27.
[95] R23.
[96] *See* Reply at ¶ 138.
[97] Rejoinder at ¶ 23.
[98] C41.
[99] As explained in footnote 3, *supra*, for the sake of argument, the Arbitrator assumed in the first instance that any alleged misrepresentations by Woods were attributable to Monsoon.
[100] Second Am. Defense and CC at p. 26; RPH Reply at p. 21 (summarizing alleged misrepresentations).

if it did not, in fact, rely[101] on any of the alleged misrepresentations; and the evidence established that Respondent did not so rely. In particular, the evidence showed that: (i) Magic Micro decided to undertake the transaction with Monsoon because of its interactions with third party Alex Hong and Hong's touting of connections between Monsoon and the Rothschild family; and (ii) to the extent Magic Micro did rely on a White Paper, it relied on an early version provided by Hong, and not the version of the White Paper that Claimant provided to Magic Micro and updated during the due diligence process, as confirmed by Kwon's analysis and description of the "original" White Paper.[102]

166.    Respondent also alleges misrepresentations as to the state of Monsoon's technology, its valuation, and plans to proceed with an ICO. However, Claimant consistently maintained that an initial round of funding was required to integrate the three source technologies it planned to use to create a decentralized storage network, powered by blockchain and a native token, and the White Paper cautioned that it contained forward-looking statements.[103]

### c.    Other Potential Excuses for Respondent's Failure to Perform

167.    Respondent argues that even if the SPA and the Extension Agreement are valid and enforceable, Magic Micro is excused from performance due to impossibility, impracticability and frustration of purpose.[104]

168.    Respondent submits that under New York law, a party to a contract may be excused from performance if that performance has become impossible or commercially impracticable.[105] Furthermore, impossibility of performance does not mean absolute impossibility under New York law, but may include impracticability because of extreme and unreasonable difficulty, expense, injury or loss.[106] Here, Magic Micro says that the unexpected unavailability of third party financing transformed the essential nature of the transaction for Magic Micro, changing it from one in which Magic Micro would be a conduit for third party investment to one in which it would be required to fund the purchase itself, which neither party

---

[101] *Washington v. Kellwood Co.*, No. 05 Civ. 10034, 2009 WL 855652, (S.D.N.Y. Mar. 24, 2009), cited by Claimant at CPH Brief at ¶ 101.

[102] *See* CPH Brief at pp. 26-30.

[103] *See* CPH Brief at pp. 26-34. Claimant persuasively refutes the full litany of alleged misrepresentations in its Post-Hearing Brief.

[104] *See* Rejoinder §§ IV a-b; RPH Brief at pp. 13-14.

[105] Second Amended Defense and CC at p. 37, citing *Kinzer Const. Co. v. State,* 125 N.Y.S. 46, 54 (N.Y. Ct. Cl. 1910).

[106] Second Amended Defense and CC at pp. 36-37, citing, inter alia, *Lowenschuss v. Kane,* 520 F.2d 255, 265 (2d Cir. 1975). Claimant counters that "where impossibility or difficulty of performance is occasioned only by financial difficulty or economic hardship, even to the extent of insolvency or bankruptcy, performance of a contract is not excused." *See* Reply at 117, citing *Sassower v. Blumenfeld,* 24 Misc. 3d 843 (2009). However, it is unnecessary to resolve these tensions in New York case law because the possibility that third party financing would fall through was a foreseeable risk that could have been guarded against by contract and the law is clear that a defense of impossibility or impracticability will not be recognized in these circumstances.

intended at the time of contracting and which would place burdens on it that were commercially impracticable.[107]

169.    These defenses fail because the doctrine of impossibility only applies in New York law where an unanticipated event occurs that could not have been foreseen or guarded against in the contract.[108]

170.    That is not the case here. Respondent tries to argue that compliance with Korean securities regulations precluded it from insisting upon the inclusion of a third party financing condition precedent in the SPA or the Extension Agreement, but its witness on Korean legal matters, Byung-Ju Kim, testified that third party financing could have been incorporated provided that they informed Korean regulators.[109] The evidence presented at the hearing also established that Magic Micro never even raised or discussed with Monsoon including such a condition in the operative agreements, even though Jang testified that he expressly discussed Magic Micro's finance limitations with Hong and GNK, Broadline, and Thorne.  For these reasons, Magic Micro's failure to obtain third party financing was a risk that could have been anticipated in the agreements made by the Parties but that was not.  Defenses of impossibility and impracticability therefore fail.

171.    Because the failure to obtain third party financing was foreseeable, the defense of frustration also fails.  Under New York law, the doctrine of frustration discharges a party's duty to perform under a contract only where an *unforeseen event* occurs and destroys the underlying reasons for performing a contract.[110]  Again, the failure of third party financing was a foreseeable risk.

### d.    Damages and Interest

172.    Sections 1.1(c) and 5 of the SPA clearly and unambiguously obligated Respondent to pay Claimant, by the Closing Date, a total purchase price of $30 million in exchange for Series A Shares in Monsoon.

173.    When Magic Micro failed to do so, the Parties agreed to extend the date for Respondent to complete the funding.  Pursuant to Sections 3 and 4 of the Extension Agreement, Magic Micro was obligated to pay Monsoon $12 million of the purchase price by 15 March 2019 and the Parties agreed that if Respondent failed to do so: "all obligations due under [the Extension Agreement] and all other existing obligations of Magic Micro under the Series A Agreements," would become "immediately due and payable" with interest in the "amount of one percent 1% per month until paid in full."

---

[107] Second Amended Defense and CC at p. 36.
[108] CPH Brief at ¶ 80, citing *Kel Kim Corp. v. Central Mkts.*, 70 N.Y.2d 900, 902 (1987).
[109] Tr. Day 6 at 24:23-25.
[110] CPH Brief at ¶ 98, citing *Matter of Fontana D'Oro Foods, Inc.*, 122 Misc.2d 1091 (1983).

174.  Consequently, by the plain terms of the Parties' agreements, as of 15 March 2019, Claimant was entitled to $27 million, plus interest[111] in the amount of one percent per month until paid in full.[112] Claimant does not dispute that Respondent should receive the corresponding Series A Shares upon payment (which would avoid a windfall), and therefore this Final Award includes an order directing that transfer.[113]

175.  Under New York law, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.[114] Because the Parties expressly agreed in Section 4 of the Extension Agreement that the full purchase price would be due to Claimant immediately in the event of Respondent's failure to make an interim $12 million payment,[115] it is unnecessary for the Arbitrator to resolve disputed questions regarding the general measure of damages under New York law when a party fails to purchase shares of stock.[116]

176.  In addition to the $27 million due under the SPA and the Extension Agreement for purchase of the Series A Shares, Claimant seeks $300 million in consequential damages based upon A's Japan's failure to purchase Monsoon Coin under the Token Subscription Agreement, which it says arose because of Respondent's failure to fund.

177.  However, consequential damages are only recoverable if they were foreseeable at the time or prior to contracting: "such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."[117]

178.  To determine whether the particular consequential damages, and the breaching party's assumed liability for them, were contemplated by the parties at the time of contracting, the analysis begins with an examination of the language of the contract.[118] Here, although Monsoon had entered into the Token Subscription Agreement as of the date of the Extension Agreement, it did not seek to make reference to the A's Japan deal in the Extension Agreement or to hold Magic Micro liable for any investment failures triggered by failure to purchase the Series A Shares. Monsoon cannot identify any contractual term indicating Magic Micro's notice of, and agreement to be responsible for, A's Japan's (or any third party's) failure, refusal, or inability to complete a subsequent investment deal with Monsoon. Claimant's claim for consequential damages thus fails.

---

[111] Claimant submitted this is a compound rate (*see* Reply at ¶ 207) and no objection was made by Respondent.
[112] CPH Brief at ¶ 23.
[113] CPH Reply at ¶ 36.
[114] *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013), cited by Claimant at CPH Brief at ¶ 54.
[115] Reply at ¶ 198.
[116] *See* CPH Brief at ¶¶ 20ff; RPH Brief at p. 20 ff.
[117] CPH Brief at ¶ 208, citing *Chapman v. Fargo*, 223 N.Y. 32, 36 (1918).
[118] RPH Brief at p. 33, citing *Goodstein Const. Corp.*, 80 N.Y.2d 366, 372 (1992).

179.    Lastly, the Arbitrator has considered Respondent's arguments in relation to Claimant's alleged failure to mitigate damages (including Respondent's request for an adverse inference) and finds them unavailing.

180.    It is undisputed that a claimant has a duty to actively minimize any claimed damages resulting from a breach of contract, and the failure to do so precludes it from recovering those claimed damages. Here, however, it cannot seriously be contested that Monsoon failed to make reasonable attempts to mitigate its damages because after Magic Micro failed to fund under the SPA, the Parties worked to together to secure alternative funding, although no leads proved to be feasible.[119] Further, although Respondent contends Claimant withheld documents showing efforts to mitigate and that it is therefore entitled to an adverse inference that Claimant did not, it ignores documentation Claimant did produce, such as letters from April and June 2019 exchanged with Goetzpartners Corporate Finance S.A.S.[120]

### B.    Claimant's Alternative Claims

181.    In light of the Arbitrator's findings above with respect to Claimant's breach of contract claim, it is unnecessary to resolve Claimant's alternative claims and arguments for either an account stated (or the underlying issue of whether that argument or claim should be deemed inadmissible, based on Respondent's objection), or breach of the implied duty of good faith and fair dealing.

### C.    Requests for Relief Relating to the Note

182.    Claimant argues that it is entitled to cancellation of the Note because the Note was automatically converted into shares,[121] whereas Respondent contends that under the express terms of the Note and NPA, conversion never occurred, and, instead, Magic Micro is entitled to repayment of its $3 million loan to Monsoon with interest.[122]

183.    Relevant provisions of the Note and the NPA are set out above. Pursuant to the Note, the $3 million Magic Micro loaned to Monsoon is repayable with interest upon demand at any time after the Maturity Date of September 24, 2020, unless the loan is converted into Conversion Shares prior to the Maturity Date, pursuant to Section 2.2 of the NPA.

184.    The loan is converted only upon the "**closing** of the **Next Equity Financing**," which is defined as Monsoon's "**receipt** of gross financing proceeds of at least **$5 million**" (excluding proceeds received from Monsoon's issuance of convertible notes).[123]

---

[119] CPH Brief at ¶ 198.
[120] C124, C125.
[121] CPH Brief at ¶ 238.
[122] RPH Reply at ¶ 4.
[123] *See* Note, § 2; NPA, §§ 1(i), 2.2(a) (emphasis added).

Here, conversion never occurred because Monsoon neither: (a) closed an equity financing agreement; nor (b) received at least $5 million in equity financing proceeds.

185.  According to the terms of the Note, since the Maturity Date has passed without conversion of the shares, Magic Micro is entitled on demand to $3 million plus 5% annual compounding interest accruing from the date of the Note of 27 September 2018.  Accordingly, Magic Micro's request for an award repaying its USD 3,000,000 loan to Monsoon, plus 5% annual compounding interest as provided for under the NPA and Note is granted.

### D.  Other Counterclaims

186.  Respondent alleges that by requesting cancellation of the Note, Claimant committed anticipatory breach.[124]  However, such a counterclaim only succeeds if there are positive and unequivocal signs that the other party will not perform as agreed.[125]  Claimant denies there can be any such claim here because it has never stated that it would not perform its obligations in relation to any cancellation, namely, providing the Shares.  The Arbitrator agrees and the counterclaim for anticipatory breach is therefore dismissed.

187.  Respondent's counterclaims for rescission and reformation depend on proof of fraud or mutual mistake of fact.[126]  In light of the Arbitrator's findings above rejecting Magic Micro's contentions about misrepresentations and reliance, as well as the absence of any understanding or agreement with respect to a financing condition precedent, these counterclaims lack merit and are dismissed.

## VIII.  Costs and Attorneys' Fees

188.  Pursuant to Section 6.13 of the SPA, "the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements in addition to any other relief to which such party may be entitled."[127]

189.  For the reasons set forth above, Claimant is the prevailing party and therefore entitled to recover its reasonable attorneys' fees, costs, and necessary disbursements.

190.  Claimant submits that its legal (counsel) fees and disbursements were $138,460.30 and the costs of transcription services were $10,743.52.[128]  The amounts claimed were evidenced by redacted invoices and the Arbitrator finds that Claimant is

---

[124] Rejoinder at ¶¶ 39-40.
[125] CPH Brief at ¶¶ 243 ff.
[126] CPH Brief at ¶¶ 50ff, citing *Goodison v. Goodison*, 66 A.D.2d 923, 924 (1978), aff'd, 48 N.Y.2d 786; *Canfield v. Reynolds*, 631 F.2d 169, 170 (2d Cir. 1980).
[127] *See also* SPA, § 6.8.
[128] CPH Reply at ¶ 64.

entitled to recover such amounts from Respondent.

191.    Claimant also seeks to recover amounts paid to the ICDR for administrative fees and arbitrator compensation and is awarded such amounts.

## IX.    Award

192.    For the reasons stated above, the undersigned arbitrator hereby AWARDS as follows:

   a.    Magic Micro Co., Ltd. shall pay Monsoon Blockchain Storage, Inc. US $27 million for breach of contract.

   b.    Interest shall accrue on such amount from 15 March 2019 through and until the amount is paid in full at a compounding rate of 1% per month.

   c.    Within thirty days of being paid the amount set forth in subparagraph (a), Monsoon Blockchain Storage, Inc. shall deliver to Magic Micro Co., Ltd. Series A Preferred Stock in Monsoon, par value US $0.0001 per share, for an investment under the Preferred Stock Purchase Agreement of US $27 million.

   d.    Monsoon Blockchain Storage, Inc. shall pay Magic Micro Co., Ltd. US $3 million plus 5% annual compounding interest accruing from 27 September 2018 and until the amount is paid in full.

   e.    As the non-prevailing party in the arbitration, Magic Micro Co., Ltd. shall pay Monsoon Blockchain Storage, Inc. legal fees and disbursements in the amount of US $138,460.30 and the costs of transcription services in the amount of US $10,743.52.

   f.    Since the administrative fees of the ICDR totaling US $96,035.00 and the compensation of the Arbitrator totaling US $133,920.00 shall be borne 100% by Magic Micro Co., Ltd., Magic Micro Co., Ltd. shall reimburse Monsoon Blockchain Storage, Inc. the sum of US $143,640.00, representing that portion of said fees in excess of the apportioned costs previously incurred by Monsoon Blockchain Storage, Inc.

   g.    All amounts awarded herein shall be paid within thirty days from the date of transmittal of the Final Award to the Parties.

   h.    This Final Award is in full settlement of all claims and counterclaims submitted to this arbitration and any and all issues, claims, and counterclaims submitted to arbitration by the Parties which are not directly addressed herein are denied.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award is deemed to have been made in New York, New York, U.S.A.

Date: _14 April 2021_

Stephanie Cohen
Sole Arbitrator

State of NEW YORK                    )
                                     ) SS:
County of _Kings_                    )

On this _14th_ day of April 2021 before me personally came and appeared Stephanie Cohen, to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed the same.

Notary Public

WARREN J GOODRIDGE
Notary Public - State of New York
NO. 01GO6299876
Qualified in Kings County
My Commission Expires Mar 24, 2022

37